1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDUARDO RECIO, | ) | 1:10-cv-01872 GSA |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S** |
| | ) | **SOCIAL SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

11

12

13

14

15

16

17

18 **BACKGROUND**

19    Plaintiff Eduardo Recio ("Plaintiff") seeks judicial review of a final decision of the

20 Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for

21 disability insurance and supplemental security income benefits pursuant to Titles II and XVI of

22 the Social Security Act.  The matter is currently before the Court on the parties' briefs, which

23 were submitted, without oral argument, to the Honorable Gary S. Austin, United States

24 Magistrate Judge.[1]

25

26

27

28    [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (*See* Docs. 8 & 9.)

1

**FACTS AND PRIOR PROCEEDINGS[2]**

Plaintiff filed an application for disability insurance and supplemental security income benefits in May 2007, alleging disability beginning June 1, 2006.  AR 170-186.  Plaintiff's application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 75-78, 84–86, 89-93, 97-101.  ALJ Robert M. Erickson held a hearing on November 16, 2009, and issued an order denying benefits on January 26, 2010, finding Plaintiff was not disabled.  AR 9-18, 121-124.  On August 27, 2010, the Appeals Council denied review.  AR 1-3.

**Hearing Testimony**

ALJ Erickson held a hearing on November 16, 2009, in Bakersfield, California.  Plaintiff appeared and testified with the assistance of a Spanish language interpreter.[3]  He was also assisted by attorney Sylvia Lopez.  Vocational Expert ("VE") Linda M. Ferra and Medical Expert ("ME") Joselyn E. Bailey also testified.  AR 18-72.

Plaintiff completed the sixth grade in Mexico.  Since coming to the United States, Plaintiff has not received any additional education, including instruction in English as a second language.  AR 37-38.  He learned his trade - cooking - by working in restaurants.  AR 38.

Plaintiff has not worked in a restaurant since June 2006.  His sister does most of the cooking.  When asked whether he can chop the vegetables, Plaintiff replied, "[n]ot real good."  He explained that he can take the vegetables out for the meal, but he cannot cut or chop them.  He "can't see too well" and fears cutting himself.  AR 40.  Plaintiff occasionally helps his sister make and sell objects at swap meets once or twice a week.  AR 39.  He currently resides with his mother, sister and nephew in Bakersfield.  AR 39-40.  When asked about grocery shopping, Plaintiff indicated that his sister does the shopping because the insulin he takes makes him tired.  AR 40.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] The proceedings commenced with the assistance of a Ms. Lareechy as interpreter, however, Ms. Lareechy was dismissed after it appeared her interpretations were inaccurate.  AR 26-28.  A second interpreter, a Ms. Marta, provided translation via telephone commencing on page 36 of the Administrative Record.

1    Plaintiff has a driver's license.  He has not driven beyond Bakersfield since June 2006.

2  AR 41.  On average, Plaintiff will drive once a week, but he does not go far.  AR 42.  When

3  asked whether he can see street or highway signs, Plaintiff indicated he can "see them close but

4  not when they're far."  AR 47.  He can read street signs located on poles on street corners.  AR

5  48.  Plaintiff has been a passenger in a car traveling to Los Angeles.  However, the driver will

6  stop every half hour or so because Plaintiff's feet go numb.  AR 45.  He attends church one a

7  week or once every two weeks.  AR 44.  He has difficulty standing and sitting throughout the one

8  hour church service.  AR 45.  Plaintiff does not attend other functions.  AR 44.  He occasionally

9  goes shopping with his sister.  AR 46.

10    Occasionally, Plaintiff goes to the park with his sixteen-year-old nephew who participates

11  in sports.  AR 42.  He has difficulty walking to the park however because he cannot see the

12  sidewalk well.  AR 42.  He becomes tired after two to three blocks and feels pain in his feet.  AR

13  42.  When Plaintiff was asked about when he first noticed pain in his feet, he indicated it was

14  about the time he was diagnosed with diabetes.  AR 43.

15    Nine to ten pounds is the heaviest weight Plaintiff is able to lift around the home because

16  of back pain.  He has advised his doctors about the back pain.  AR 43.  With regard to his ability

17  to sit, Plaintiff stated that he becomes tired after sitting for a while.  Asked to estimate how long

18  he could sit in a chair before he became uncomfortable, Plaintiff indicated about a half an hour.

19  Otherwise, his back and feet hurt.  AR 43.  If he walks too much, his legs develop purple bruises.

20  That has been the case for about a year.  AR 43-44.  He has told his doctors about his difficulty

21  walking.  AR 44.

22    Both English and Spanish newspapers are delivered to the home Plaintiff shares with his

23  family.  He cannot read the English only paper.  He cannot read an article in the Spanish paper,

24  rather only a word or two.  AR 45-46.  He does not watch much television because his eyes hurt.

25  He listens to the radio in Spanish, but gets bored with it.  AR 46.  He did learn the names of

26  dishes in English while cooking in restaurants.  AR 47.

27    ME Bailey reviewed the medical record information from 2006 through November 2007.

28  AR 28.  The ME briefly summarized the information.  AR 28-30.  Asked whether Plaintiff met

1  any listed impairment, the doctor replied in the negative.  AR 30.  With specific regard to

2  diabetes mellitis with neuropathy, Plaintiff did not meet the listing because there was no

3  significant and persistent disorganization in motor functions in two extremities resulting in

4  sustained disturbance of gross and dexterous movements or gait and station, nor retinitis

5  proliferation.  AR 31.  Further, there was no indication in any medical visual report of macular

6  degeneration.  In fact, one report indicated that Plaintiff was not legally blind and continued to

7  drive.  AR 31.  Even considering the diabetes, together with the cataracts and retinopathy, this

8  does not result in Plaintiff meeting a listed impairment.  Cataracts are very treatable and do not

9  "figure in the listings evaluations."  AR 31.  With regard to exertional limitations, the ME

10 indicated Plaintiff has no restriction with regard to lifting and carrying, or standing and walking.

11 AR 32.

12        When asked by Plaintiff's counsel about exhibit "7E" dated July 3, 2007,[4] the ME

13 indicated that the doctor's reference to Plaintiff's need for urgent laser and antiangiogenic

14 therapy in both eyes relates to his diabetes and the fact that retinopathy is destructive to the retina

15 and can be "clear[ed] up" or improved with laser treatment.  The doctor's reference, according to

16 the ME, calls for laser treatments "pretty soon to prevent anything getting worse."  AR 33.

17        While indicating she was "not an eye doctor," the ME answered the ALJ's question

18 regarding whether blank spots, actual dark circles or floaters appear in one's field of vision as a

19 result of hemorrhage:

20        [U]sually if it's 20/100, instead of 20/200 for example, they have - - what
          they can - - they have black and white vision in that eye.  They can see a hand held
21        in front of the eye, but it might be just not in color, but in black and white and
          kind of fuzzy.  It's not a good clear picture.  That's all I can determine from my
22        little knowledge of the eye.

23 AR 34.  When asked about "tractional retinal detachment," the ME indicated she was not

24 qualified to answer the ALJ's inquiry.  AR 34-35.[5]

25

26 _____

27        [4]*See* AR 312 & 332.

28        [5]ALJ Erickson then commented "we're trying to get into areas of ophthalmology, I think we'll just have to reset the hearing.  Thank you, doctor."  AR 35.

4

1    VE Ferra indicated that Plaintiff's past relevant work involves working in restaurants as a

2    cook, work considered to be skilled with an SVP[6] of 6, medium exertion.   AR 36, 48.

3    The VE was asked to consider a hypothetical worker of Plaintiff's age, education and

4    work history, with a limitation to only occasionally performing tasks requiring peripheral visual

5    acuity and depth perception.  AR 48-49.  The VE indicated that such an individual could perform

6    Plaintiff's past work because the Dictionary of Occupational Titles ("DOT") provides that depth

7    perception is an occasional accommodation as compared to near acuity that is frequent.  AR 49.

8    In a second hypothetical, the VE was asked to assume a hypothetical worker of Plaintiff's

9    age, education and work history, with the ability to lift less than ten pounds either occasionally or

10   frequently, who can stand or walk less than two hours in an eight-hour workday, who can sit for

11   six hours in an eight-hour workday but no more than thirty minutes at one time, with occasional

12   peripheral vision, but whom has no other postural or manipulative limitations.  AR 49.  VE Ferra

13   indicated such an individual would be unable to perform Plaintiff's past work because of the

14   limitation to light work.  AR 49.

15   In a third hypothetical, the VE was asked to consider an individual who could perform

16   medium work, but whom could only stand or walk for two hours in an eight-hour day.  AR 49-

17   50.  That too would eliminate Plaintiff's past work.  AR 50.

18   VE Ferra indicated that Plaintiff's past work did not provide him with any transferable

19   skills to sedentary work.  AR 50.

20   When asked to clarify the DOT regarding visual acuity, VE Ferra explained that the DOT

21   requires the ability to perform work frequently with near visual acuity, such as work performed at

22   a table.  AR 50-51.  VE Ferra indicated that she has experience placing individuals in the cooking

23   trade.  AR 52.  In the VE's opinion, even a worker who was unable to see in one eye would be

24   able to perform the duties of a cook on a forty-hour work week basis, with the required level of

25   persistence and pace.  AR 52.  However, when the VE was asked by counsel to consider

26

27

28
         [6]"SVP" refers to Specific Vocational Preparation.

5

1  Plaintiff's testimony that he cannot cut or chop, she indicated that a hypothetical worker with

2  those same limitations would be unable to perform the work of a cook.  AR 53.

3         The ALJ then asked the VE to consider a hypothetical worker capable of sedentary work

4  only, who has no vision in the right eye, aged fifty to fifty-three with a sixth grade education and

5  whom is illiterate in English.  AR 55.  Work would be available to such an individual in the

6  following representative examples: as an outside deliverer, DOT 230.663-010, unskilled and

7  light, with 12,000 positions available in California; and, as an assembler, DOT 739.687-026,

8  unskilled and light, with 12,000 positions available.  National figures are obtained by a multiple

9  of ten.  AR 55.[7]

10         **Medical Record**

11         The entire medical record was reviewed by the Court.  AR 244-590.  The medical

12  evidence will be referenced below as necessary to this Court's decision.

13         **ALJ's Findings**

14         Using the Social Security Administration's five-step sequential evaluation process, the

15  ALJ determined that Plaintiff did not meet the disability standard.  AR 12-18.

16         More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful

17  activity since June 1, 2006.  AR 14.  Further, the ALJ identified the following severe

18  impairments: diabetes mellitus with retinopathy, hypertension and cataracts.  AR 14-15.

19  Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments did not meet or

20  exceed any of the listed impairments.  AR 16.

21         Based on his review of the entire record, the ALJ determined that Plaintiff has the

22  residual functional capacity ("RFC") to perform the full range of work at all exertional levels

23  with a nonexertional limitation to occasionally performing tasks requiring peripheral visual

24  acuity and depth of field perception.  AR 16-17.

25

26

27         [7]The Court notes that the transcript from the administrative hearing in this matter demonstrates the various
28  participants routinely spoke over one another, resulting in very convoluted, often unhelpful passages of testimony.
    This was particularly so regarding the hypothetical questions posed and testimony pertaining to visual acuity.

1    Next, the ALJ determined that Plaintiff could perform his past relevant work as a cook.

2    AR 18.  Therefore, the ALJ found Plaintiff was not disabled.  AR 18.

3                                          **SCOPE OF REVIEW**

4    Congress has provided a limited scope of judicial review of the Commissioner's decision

5    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

6    this Court must determine whether the decision of the Commissioner is supported by substantial

7    evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

8    *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

9    *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

10   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

11   401.  The record as a whole must be considered, weighing both the evidence that supports and

12   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

13   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

14   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

15   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

16   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

17   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

18   Cir. 1987).

19                                             **REVIEW**

20   In order to qualify for benefits, a claimant must establish that he is unable to engage in

21   substantial gainful activity due to a medically determinable physical or mental impairment which

22   has lasted or can be expected to last for a continuous period of not less than twelve months.  42

23   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

24   such severity that he is not only unable to do her previous work, but cannot, considering his age,

25   education, and work experience, engage in any other kind of substantial gainful work which

26   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

27   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

28   Cir. 1990).

1   Here, Plaintiff argues that the ALJ's findings are not supported by substantial evidence

2 and are not free of legal error because the ALJ failed to properly consider the opinion of Dr. Lee.

3 (Doc. 12 at 6-9.)

4             **DISCUSSION**

5    ***The ALJ's Consideration of the Medical Opinion Evidence***

6   Plaintiff argues that the ALJ erroneously rejected the opinion of state agency reviewing

7 physician Peter L. Lee, M.D.  More specifically, he asserts the ALJ failed to even consider the

8 doctor's opinion, nor did he provide specific and legitimate reasons for rejecting the expert's

9 opinion as it relates to Plaintiff's ability to perform work that requires depth perception.  (Doc.

10 12 at 6-9.)  The Commissioner argues no error occurred.  (Doc. 15 at 4-6.)

11     **1.**   **Applicable Legal Standards**

12   Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

13 who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

14 (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

15 physicians).  As a general rule, more weight should be given to the opinion of a treating source

16 than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

17 647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another

18 doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

19 1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another

20 doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

21 reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

22 F.2d 499, 502 (9th Cir. 1983).

23   The opinion of an examining physician is, in turn, entitled to greater weight than the

24 opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990);

25 *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating

26 physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

27 uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506.  And like the opinion

28 of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

1   can only be rejected for specific and legitimate reasons that are supported by substantial evidence

2   in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

3          The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence

4   that justifies the rejection of the opinion of either an examining physician or a treating physician.

5   *Pitzer v. Sullivan*, 908 F.2d at 506 n.4; *Gallant v. Sullivan*, 753 F.2d at 1456.  In some cases,

6   however, the ALJ can reject the opinion of a treating or examining physician, based in part on the

7   testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55

8   (9th Cir. 1989); *Andrews v. Shalala*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.

9   1995).  For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a

10  treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to

11  reject the opinions of Magallanes's treating physicians . . .." *Magallanes*, 881 F.2d at 752.

12  Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also

13  relied on laboratory test results, on contrary reports from examining physicians, and on testimony

14  from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

15                  **2.       Summary of Relevant Medical Evidence**

16                  **a.       Steven M. Yaplee, M.D.**

17         On July 3, 2007, Plaintiff saw Steven M. Yaplee, a board certified ophthalmologist and

18  glaucoma specialist for a disability evaluation.  Following examination, Dr. Yaplee noted visual

19  acuity of 20/100 in the right eye and 20/25  -2 in the left eye.  Moderate cataracts[8] were present

20  without evidence of rubeosis.[9]  Examination of the right eye revealed tractional retinal

21

22

23

24

25         [8]"A cataract is a clouding of the lens in the eye that affects vision." *See*
26  http://www.nei.hih.gov/health/cataract/cataract_facts.asp.

27         [9]"[R]ubeosis i´ridis [is] a condition characterized by a new formation of vessels and connective tissue on the
    surface of the iris, frequently seen in diabetics."  *See* http://medical-dictionary.thefreedictionary.com/rubeosis.

28

detachment[10] with dense vitreous hemorrhage[11] and peripheral diabetic retinopathy.[12]

Examination of the left eye revealed old laser scarring and slight vitreous hemorrhage, circinate

exudate with background diabetic retinopathy.[13]  The doctor's impressions included peripheral

diabetic retinopathy in both eyes, status post "PRP" left eye, vitreous hemorrhage, right eye

worse than left, tractional retinal detachment, right eye, and cataracts in both eyes.  It was noted

that visual field in the left eye revealed mild peripheral changes.  Dr. Yaplee concluded Plaintiff

was not legally blind, but recommended Plaintiff receive "urgent laser and antiangiogenic[14]

therapy to both eyes."  AR 312, 332.

### b.     Peter L. Lee, M.D.

On August 2, 2007, reviewing internal medicine specialist Peter L. Lee noted Plaintiff

had good vision in the left eye and decreased vision in the right eye.  Such a condition would

"preclude him from working in any job that requires depth perception."  A suggestion notes as

follows: "Only ocular limitation is no work where depth perception is essential."  AR 335; *see*

*also* AR 336.

---

[10]Tractional retinal detachment is described as "scar tissue on the retina's surface contracts and causes the retina to separate from the [retinal pigment epithelium]. This type of detachment is less common."  *See* http://www.nei.nih.gov/health/retinaldetach/retinaldetach.asp.

[11]According to the American Academy of Ophthalmology, "[v]itreous hemorrhage has an incidence of seven cases per 100,000, which makes it one of the most common causes of acutely or subacutely decreased vision."  *See* http://www.aao.org/publications/eyenet/200703/pearls.cfm.

[12]"Diabetic eye disease refers to a group of eye problems that people with diabetes may face as a complication of diabetes. All can cause severe vision loss or even blindness. . . . Diabetic retinopathy is the most common diabetic eye disease and a leading cause of blindness in American adults. It is caused by changes in the blood vessels of the retina."  *See* http://www.nei.nih.gov/health/diabetic/retinopathy.asp.

[13]"Circinate" is defined as "[c]ircular; ring-shaped" and "exudate" is defined as "[a] fluid that has exuded out of a tissue or its capillaries due to injury or inflammation."  *See* http://medical-dictionary.thefreedictionary.com.

[14]"Antiangiogenic therapy inhibits the growth of new blood vessels. Because new blood vessel growth plays a critical role in many disease conditions, including disorders that cause blindness, arthritis, and cancer, angiogenesis inhibition is a 'common denominator' approach to treating these diseases."  *See* http://medical-dictionary.thefreedictionary.com /Antiangiogenic+Therapy .  Regarding antiangiogenic therapy and diseases of the eyes, "[e]xcessive new blood vessels growing in the eye can cause vision loss and lead to blindness. Antiangiogenic treatments may prevent progressive loss of vision or even improve eyesight in patients."  *Ibid*.

1        **c.    Sergio R. Bello, M.D.**

2        On August 2, 2007, reviewing internal medicine specialist Sergio R. Bello's

3  recommendations provide as follows "[b]ecause retinopathy and glaucoma are clear problems in

4  this case with decreased visual acuity and need for further treatment, some visual restrictions may

5  be appropriate and I will defer to the ophthalmology specialist for guidance." AR 334.[15]

6        **d.    Paul F. Frye, M.D.**

7        On August 14, 2007, surgeon Paul F. Frye, M.D. prepared a Physical Residual Functional

8  Capacity Assessment.  He identified no exertional, postural, manipulative, communicative or

9  environmental limitations for Plaintiff.   AR 338-342.  The doctor did identify a visual limitation

10  in depth perception.  However, while the doctor cited the facts upon which he based his

11  conclusion, he did not explain how Plaintiff was limited in that area.  AR 340.

12        **3.    ALJ's Findings**

13        Here, ALJ Erickson found as follows:

14        Independent medical expert, Joselyn Bailey, M.D. testified that based on
    her review of the record, there would be no exertional limitations as a result of the
15    claimant's diabetes, hypertension or cataracts because he has not had any
    complications besides his decreased visual acuity due to diabetic retinopathy.
16        Turning to the claimant's retinopathy, he noticed a decrease in his visual
    acuity in 2005.  The claimant underwent an ophthalmologic consultative
17    examination in 2007 with Steven Yaplee, M.D., wherein he was diagnosed with
    peripheral diabetic retinopathy in both eyes, vitreous hemorrhage in both eyes and
18    fractional [*sic*] retinal detachment on the right.  At this time, the claimant's visual
    acuity was documented as 20/100 on the right and 20/25 on the left, which is not
19    serious enough to be considered legally blind.  The claimant has undergone at
    least two laser procedures on each eye and wears corrective eye glasses.  By 2008,
20    the claimant was able to see approximately 20 feet in front of him with his right
    eye and has been able to continue driving without any license revocation by the
21    Department of Motor Vehicles.[[16]]
        As for the opinion evidence, I give the most probative weight to the
22    independent medical expert opinion of Dr. Bailey who finds that the claimant has
    no exertional limitations as it is supported by the objective medical evidence and
23    is consistent with the record as a whole.  In additional, Dr. Bailey has the
    advantage of hearing the claimant's testimony after review of the medical record

24

25  _____

26        [15]It can be reasonably inferred from Dr. Bello's final comment that he too noted the fact Dr. Yaplee's
    opinion does not speak to the functional limitations.

27        [16]The fact that Plaintiff maintains a driver's license and occasionally drives a vehicle for short distances
    around his hometown is not evidence he is not visually disabled.  The Court is not aware of any requirement that
28  Plaintiff relinquish his driving privilege by virtue of his claim of a visual impairment that affects his ability work.

1    and the ability to ask the claimant any questions necessary in making her medical
     determination.

2          I also give full weight to the consultative examination opinion of Dr.
     Yaplee who finds that the claimant is not legally blind, but does have some

3    limitations in his visual acuity.  Dr. Yee's [*sic*] opinion is supported by medical
     testing performed at the time of the evaluation and is consistent with the record as

4    a whole.  Moreover, Dr. Yee [*sic*] is board certified in ophthalmology with
     provides him with knowledge, training and a perspective not shared by the other

5    providers of record and which could reasonably be expected to give him greater
     insight into the limitation imposed by the claimant's visual impairment.

6          It should be noted that the record does not contain any opinions from
     treating physicians indicating that the claimant is disabled or even has limitations

7    greater than those determined in this decision.
            In sum, the above residual functional capacity assessment is supported by

8    the substantial weight of the objective medical evidence, the lack of complications
     other than decreased visual acuity due to his diabetes, the claimant's ability to

9    drive and the opinions of Drs. Bailey and Yee [*sic*], which have been given
     significant weight for the reasons cited above.

10

11   AR 17, internal quotations omitted.

12                     **4.       Analysis**

13                     **a.       State Agency Opinion**

14         Here, Plaintiff is correct that the ALJ failed to address the opinion of state agency

15   reviewing physician Dr. Lee.  Evidence from state agency consultant physicians must be treated

16   as "expert opinion evidence."  As such, the ALJ "may not ignore these opinions and must explain

17   the weight given to these opinions in their decisions."  Social Security Ruling 96-6p.[17]  Dr. Peter

18   Lee opined that Plaintiff's visual impairments "will preclude him from working in any job that

19   requires depth perception," and then went on to suggest that "[o]nly occular limitation is no work

20   where depth perception is essential."  AR 335.  The ALJ's findings neither expressly reference

21   the doctor's opinion, nor do the internal citations relied upon refer to the doctor's opinion.  *See*

22   AR 16-17.

23         Because the ALJ did not address this opinion, and because this Court has already noted

24   the confusing nature of the hearing testimony with regard to Plaintiff's visual impairment and

25   any affect it would have on work, this Court cannot state with any degree of certainty that the

26

27

28         [17]Social Security Rulings are binding on the Commissioner.  *See Terry v. Sullivan*, 903 F.2d at 1275, n.1.

1    nature of Plaintiff's visual impairment would permit him to perform his past relevant work, as

2    the ALJ found.  *See* n.7, *ante*.

3          The Court acknowledges that the opinion of an examining physician is entitled to greater

4    weight than a non examining physician (*Pitzer v. Sullivan*, 908 F.2d at 506; *Gallant v. Heckler*,

5    753 F.2d 1450), however, here Dr. Yaplee did not address the functional limitations his

6    impressions or findings would impose in a work setting, whereas Dr. Lee's opinion does so.

**b.       Other Concerns**

8          The Court notes its other concerns regarding the ALJ's findings in this matter.

9          ALJ Erickson relied upon the independent medical expert opinion of Joselyn Bailey,

10   M.D.  He stated, in part, that "Dr. Bailey ha[d] the advantage of hearing the claimant's testimony

11   after review of the medical record and the ability to ask the claimant any questions necessary in

12   making her medical determination." *See* AR 17.  This statement is inaccurate and misstates the

13   administrative record.  In fact, ME Bailey was excused prior to the ALJ even taking Plaintiff's

14   testimony as the result of difficulties regarding the accuracy of language interpretation.  ME

15   Bailey's testimony appears at pages 28 through 35.  Plaintiff's testimony commences at page 37

16   of the administrative record.  Therefore, Dr. Bailey had neither the advantage of "hearing the

17   claimant's testimony," nor the ability to ask Plaintiff questions.

18         Even more troubling, however, is the fact that ME Bailey admitted she lacked the

19   qualifications necessary to interpret Dr. Yaplee's opinion in terms of any functional limitation.

20   The ME admitted she had little knowledge of the eye.  AR 34.  She could not define or explain

21   the impact of tractional retinal detachment (AR 34-35), therefore, she could not have fully

22   appreciated the impact Plaintiff's impairments would have had on his ability to perform work.

23   Shortly thereafter, the ME was excused.  The ALJ then expressly stated, "we're trying to get into

24   areas of ophthalmology, I think we'll just have to reset the hearing.  Thank you, doctor." AR 35.

25   By the ALJ's own words, the importance of the testimony of an ophthalmologist to this case was

26   clear.

27         Dr. Yaplee's opinion, upon which the ALJ also relies, does not speak to the restrictions

28   Plaintiff might face in a workplace.  Rather, it concludes that Plaintiff is not legally blind.  Dr.

13

1  Yaplee did not offer any opinion of how Plaintiff's peripheral diabetic neuropathy (present in

2  both eyes), status post "PRP" in the left eye, vitreous hemorrhage - right eye worse than left,

3  tractional retinal detachment in the right eye, and moderate cataracts in both eyes, would affect

4  his ability to work. *See* AR 312, 332-333.  The Court appreciates the fact Dr. Yaplee is board

5  certified and holds a speciality.  Nevertheless, his opinion is lacking for purposes of

6  understanding functional limitation.

7       Overall, given the cumulative effect of the ALJ's failure to address the state agency

8  physician's opinion, the confusing testimony regarding visual acuity and its impact on Plaintiff's

9  ability to work, the concerns regarding the weight afforded the ME's opinion, and the lack of any

10 sufficient explanation concerning the limitations Plaintiff's condition would impose in a

11 workplace in light of Dr. Yaplee's findings, the validity of the ALJ's findings are called into

12 question. *See, e.g., Reynolds v. Astrue*, 2011 WL 1377283 (C.D. Ill. Apr. 21, 2011); *Enriquez v.*

13 *Astrue*, 2009 WL. 806724 (D. Ariz. Mar. 26, 2009) (citing other district court authority regarding

14 reversal and remand based upon cumulative error); *Sherman v. Apfel*, 141 F.3d 1185 (10th Cir.

15 1998).  The errors identified herein are not harmless because this Court cannot confidently

16 conclude another ALJ would have reached the same conclusion. *See Stout v. Commissioner,*

17 *Social Sec. Admin*, 454 F.3d 1050, 1056 (9th Cir. 2006)

18                                          **CONCLUSION**

19       Based on the foregoing, the Court finds that the ALJ's decision is not supported by

20 substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

21 further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

22 judgment in favor of Plaintiff Eduardo Recio and against Defendant Michael J. Astrue,

23 Commissioner of Social Security.

24

25       IT IS SO ORDERED.

26  **Dated:    November 8, 2011**                        **/s/ Gary S. Austin**
                                                         UNITED STATES MAGISTRATE JUDGE

27

28